IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| MYRNA COLON-MARRERO; JOSEFINA ROMAGUERA-AGRAIT<br><br>Plaintiffs<br><br>vs<br><br>HECTOR CONTY-PEREZ, as President of the Puerto Rico State Elections; EDWIN MUNDO-RIOS, as Electoral Commissioner of the New Progressive Party; EDER E. ORTIZ-ORTIZ, as Electoral Commissioner of the Popular Democratic Party; ROBERTO I. APONTE-BERRIOS, as Electoral Commissioner of the Puerto Rican Independence Party; JULIO FONTANET-MALDONADO, as Electoral Commissioner of the Movimiento Unión Soberanista; ADRIAN DIAZ-DIAZ, as Electoral Commissioner of Puertorriqueños por Puerto Rico; LILLIAN APONTE-DONES, as Electoral Commissioner of Partido del Pueblo Trabajador<br><br>Defendants | CIVIL 12-1749CCC |

## FINDINGS CERTIFIED TO THE COURT OF APPEALS

Pursuant to an Order issued by the Court of Appeals on October 11, 2012 (docket entry 26), which required this Court to conduct an evidentiary hearing by no later than Monday, October 15, 20112 and to certify factual findings to it by 5:00 PM on Wednesday, October 17, 2012, such a hearing was held on October 15, 2012 from 9:00 AM to 9:00 PM and concluded on October 16, 2012 at 1:05 PM. Eleven witnesses testified at the hearing, to wit:

- for plaintiffs: Judge Héctor Conty-Pérez, President of the Puerto Rico State Elections Commission (SEC) who is also a defendant, and Mr. Héctor Luis Acevedo, as an expert witness;

- for defendant Eder Ortiz-Ortiz, the Electoral Commissioner of the Popular Democratic Party: Mr. Angel Alvelo-Rivera, Director of Electoral Operations at SEC;

CIVIL 12-1749CCC                              2

- for defendant Edwin Mundo-Ríos, the Electoral Commissioner of the New Progressive Party (NPP): Mr. Mundo-Ríos himself;

- for defendant Conty-Pérez, the SEC's President: Mr. Conty-Pérez himself, Mr. Guillermo Cordero, Director of the Office of Information Systems and Electronic Processing at SEC,  Ms. Luz Delia Vázquez, President of the Absentee And Advanced Ballots Board and Director of the Education and Training Office at SEC,  Mr. José Antonio González-Díaz, Sub-Director of SEC's Planning Office, Mr. Julio Bonet-Díaz, Sub-Director of SEC's Electoral Operations Office, Mr. Marco Vargas-Carrillo, senior vice-president of Caribbean Printing Corp, the company contracted by SEC to print the ballots for the November 6, 2012 elections,  Mr. José Torres-Rodríguez, Director of SEC's Purchase Office, and Ms. Maria Dolores Santiago-Rodríguez, SEC's First Vice-President.

The relevant portion of the Court of Appeals October 11, 2012 Order mentions that the record is insufficiently developed on the factual issues corresponding to the third and fourth prongs of a request for preliminary injunction, that is, the balance of harms and the effect of the decision on the public interest.  It also makes express reference to the differing parties' factual claims "with respect to the feasability of granting the request for preliminary relief, specifically of permitting the voters who have been inactivated for failure to vote in the 2008 elections to vote in the general election on November 6, 2012."  Based on the testimonial and documentary evidence presented at the hearing, this Court makes the following findings in compliance with the appellate Court's Order:

- The total number of voters who remain inactive at this time  for not having participated in the 2008 general elections is 330,902 (see Summary of the Voters' Registry Per Precinct Updated September 17, 2012, Exhibit A for defendant Edwin Mundo-Ríos). The SEC identifies them internally by using the code I-8.  They do appear in the General Voter Registry which pursuant to the definition at § 2.003(84) of the June 1, 2011 Puerto Rico Election Code (Code), is the "record prepared and kept by the State Elections

CIVIL 12-1749CCC                           3

Commission that contains the information of all the persons in Puerto Rico who have registered for election-related purposes." However, having failed to exercise their right to vote in the general election of 2008, plaintiffs' files in the General Voter Registry were inactivated pursuant to § 6.012 of the Code. That section also establishes that "the exclusion of a voter shall not entail the elimination of his/her information from the General Voter Registry." Plaintiffs seek a declaration that Article 6.012 of the new Code is "unlawful as contrary to the provisions of NVRA and HAVA" and ordering defendants to immediately activate them and others similarly situated persons as registered voters in the General Registry of Voters. Paragraph 2 of Amended Complaint (docket entry 19).

     - The Statement of Motives includes as relevant issues of the 2011 Code "adapting the Act to applicable Federal laws, such as the 'Help America Vote Act' and the 'Uniformed Overseas Citizens Absentee Voters Act.'" It also refers to the guarantee provided by the Constitution of Puerto Rico to an "equal, secret, direct and free universal suffrage" and describes expression through voting as "the most effective instrument of citizen participation." The Code sets amongst its goals "to strengthen the Island's democratic system, broaden voters' rights and reduce to the bare minimum any intervention of foreign factors with the voters' will during the election process."

     - Héctor Conty-Pérez, President of the SEC, testified that Puerto Rico now enjoys one of the best purged electoral registries during elections of the last decade because there were four electoral closures in the year 2012: the first closure of Voter Registry on January 30, 2012, the February 27, 2012 closure for the primary elections of the Popular Democratic Party, the New Progressive Party and the GOP, the third closure was June 30, 2012 for the referendum on constitutional amendments and the September 17, 2012 registry closure 50 days prior to the 2012 general election. This statement is an acknowledgment by the SEC President that the purging effect on the Registry of these four electoral closures in one same year constitutes an extraordinary situation which has not been the norm during the rest of

CIVIL 12-1749CCC                              4

the decade.  He repeatedly said that "Puerto Rico **now** enjoys one of the best purged electoral registries of the last decade" (Conty-Pérez Transcript of October 15, 2012, p. 76) and that he "measures that based on the opportunity that the SEC had to impact on the purge of the Registry in every one of those electoral closures." (Conty-Pérez Transcript of October 15, 2012, pp. 77-78).

      - Considering that this high impact purge did not occur until the first nine months of 2012, it can reasonably be inferred that before that period the General Voter Registry was not the sanitized instrument that some of the defendants portrayed.  The proof against reactivation of the 330,902 voters in the I-8 category aims to cast them as contaminants and as carriers of "bad votes," undeserving to vote in this election simply because they failed to vote in the last.  The evidence, however, demonstrates that the flaws and risks charged to the I-8 group of voters are equally present in the group of active voters in the General Registry.  The SEC President acknowledged that it is possible that in the entire registry of active voters there are many instances in which SEC does not have an accurate address for voters.  See Conty-Pérez Transcript of October 15, 2012, p. 88.  He also expressed concern that I-8 voters might die outside of Puerto Rico for the SEC does not receive death certificates from the mainland and it would be unaware of such deaths.  This concern cuts through both groups for deaths of active voters outside Puerto Rico are just as real as those of I-8 voters.  Another concern voiced by the SEC President was that even though an identification card with photo is required to vote in Puerto Rico, there could be cases of supplantation where someone else passes off as a voter.  Again, the situation of identity fraud perpetrated by a third party can occur in either group; for example, supplantation by using a lost identification card belonging to either an active or an inactive voter.  To view supplantation as creating a greater risk in the I-8 group of voters, one would have to assume that the voters in this category are aiders of the fraud committed by the person who passes off for him and that the I-8 voter, by not re-registering after deactivation, is prone to act

illegally in his future electoral participation.   Defendant Edwin Mundo testified that all persons who did not vote in the 2008 election are contaminants and violators of the electoral laws, ". . . bad votes, people who should not vote in Puerto Rico." Testimony of Edwin Mundo on October 15, 2012 PM session.

- Both factors - the deaths outside the jurisdiction and the cloud of suspicion cast upon the I-8 group - unjustifiedly magnify the burdens that the SEC purportedly confronts to meet the reentry of these 330,902 voters into the system.  This does not mean, however, that there is no need to establish safeguards if the Court ultimately allows the I-8 voters the right to vote in the 2012 general election.

- The inquiry into the practical aspects of the feasibility issue deals with the other concerns raised by defendants, such as the number of available ballots, the need for 1714 additional polling places, additional trained poll watchers, materials, and time constraints and will be discussed simultaneously with the proposal made by plaintiffs supported with the testimony of their expert witness Mr. Héctor L. Acevedo.

The Court qualified Mr. Acevedo as an expert in electoral matters in Puerto Rico.  He was a member of the Election Reform Commission from 1982 to 1983 which, by unanimous vote, recommended the Electoral Code in effect in Puerto Rico until 2011.  He served as an Electoral Commissioner for nine years, was the electoral commissioner of the Democratic Party and presided over the local Obama-Clinton primary, presided the Elections Finance Commission in 2003, has twice been a member of the Constitutional Redistricting Board in Puerto Rico in 2000 and 2010, has taught election law since 1983 until the present at Interamerican University, Catholic University Law School, and the University of Puerto Rico, is Director of the Center for Political Dynamics at the Interamerican University.

- Defendant SEC presented as an expert witness Ms. Luz Delia-Vázquez, Director of the Education and Training Office and President of the Administrative Board of the Absentee and Advanced Vote for SEC and Director from 1982 to 2008 of the "added by

hand" unit created by SEC, who was qualified by the Court as an expert in such type of electoral polling place.  She stated that for this election there are 1,533 "added by hand" polling places and explained the voting procedure there followed which is established in the SEC Regulations.

     - Professor Acevedo wholly acknowledged the SEC President's concerns regarding the need to protect the electoral system in this unique situation confronted by the Commission of a possible reactivation of 330,902 voters within a period so close to the general election.

     - He described these concerns as related to the "complex issue of a feasible reactivation process" and proffered three requirements for any such process: (1) that the regular voting process not be disrupted and the reactivation process be as less intrusive as possible, (2) that the solution adopted be simple and (3) proportional to the risk involved. Transcript of Acevedo testimony, October 15, 2012, p. 9.  Before proposing a specific procedure, he addressed the feasibility question by providing the following basic data related to three stages:

     (1) the SEC computer contains a list of the 330,902 I-8 voters[1] who are identified by name and indicates the schools to which they will be assigned.  He explained that it would take four to five days to print those lists and that four/five copies of the lists would have to be sent to each of the voting places that are going to administer the voting process. Transcript of Acevedo testimony, October 15, 2012, pp. 10-12.

     (2) There are more than 330,000 ballots already printed.  Acevedo referred to SEC President Conty-Pérez' previous testimony on direct that there is a maxim in the Commission that one and a half ballots are printed for every voter.  Conty-Pérez explained that the founders of the Commission had established that norm to avoid the excuse that

_____

[1]Of the 539,000 voters taken out of the list after the 2008 elections because they did not vote, 208,000 subsequently registered themselves, leaving out approximate 331,000 voters.  The parties have established the exact number at 330,902.

CIVIL 12-1749CCC                              7

somebody was not allowed to vote for lack of voter materials; that there are 2,402,943 active voters right now and, making reference to a purchase order, he verified the existence of 3,400,000 official ballots for the state electoral ballot and the same amount for the legislative, municipal ballots and the status plebiscite ballot, delivered in packets of 325 and 50.  See Conty-Pérez' Transcript of  October 15, 2012, p. 98.  Although the SEC President expressed that additional paper, unavailable at this time, would be needed to print ballots for the 330,902 I-8 voters if activated, his own calculations of the actual number of ballots already printed for the 2012 election, and Angel Alvelo-Rivera's testimony as Director of Electoral Operations of SEC,  prove otherwise.[2]  Defendants, except for Eder Ortiz-Ortiz and Lillian Aponte-Dones, Electoral Commissioners for the Popular Democratic Party and Working People Party, contend that these ballots have to be delivered to each electoral unit wrapped in packages of 325 or 50 as they come from the printer.  Julio Bonet-Díaz, sub-director of electoral operations at SEC, acknowledged that he could not dispute that there are approximately 448,000 additional ballots of each kind in stock at the SEC.  He insisted that they have to be delivered at the polling places in packages of 325 and 50, that and you try not to disassemble them to preserve the purity of the ballots as they come from the printer and that the ballots would have to be available in these packages in order to cover the 330,902 voters.  In his final ballot calculations, he concluded that although the total population of Puerto Rico is 4 million, and there are 3.4 million ballots printed for each of the state, legislative, municipal and plebiscite ballots, he would still need 500,000 new ballots to be printed.

        - The Court finds that it was established, both by the testimony of SEC President and by the only expert on electoral matters who testified, Héctor L. Acevedo, that there are

---

[2]The testimony of SEC witness Marco Vargas-Carrillo that he does not have paper available to print an additional 330,000 ballots has little probative value since the testimonies of Conty-Pérez and Alvelo both demonstrate that there is a surplus of ballots that have been printed which would be enough to cover the additional 330,902 voters, if reactivated.

CIVIL 12-1749CCC                                8

sufficient ballots for the I-8 voters to use on Election Day.  The following excerpt of Professor

Acevedo's testimony during the evidentiary hearing at pages 41, line 21, through page 43,

line 8, is relevant:

> Q.   You are assuming that there will be sufficient votes.  You don't know
>       that.
>
> A.   Well, I will say, based on the testimony under oath of Judge Conty, that
>       if they follow that -- and my information is he did follow that -- that they
>       printed one and a half votes per voters, that was his testimony under
>       oath -- if he says that is true, which I believe is true, and my numbers
>       are those, then you have enough ballots because those ballots are not
>       general in Puerto Rico.  Those ballots are -- precinct one, you have so
>       many voters.  And you have one and a half printed ballots for those
>       precincts -- for that precinct.  And you come to precinct two, and you
>       have one and a half printed ballots per every legitimate voter, a regular
>       voter.  And that was his testimony, and I have seen that since 1984
>       What happened?  We have a big reserve, and we have to destroy that
>       after the elections.  That was a measure that now, if this decision
>       comes down -- and, as you know, I didn't -- was part of that case -- and
>       you have the administrative responsibility of taking care of -- you have
>       the reserve to comply.  That's my opinion.
>
> Q.   So if that is the case, if using this one and a half ballots, if that rule is
>       correct, at the end of our election, how many ballots are you left with?
>       For example, in the last election.
>
> A.   In the last election, about a third, because about 80 percent of the --
>       you printed one and a half, which is 150 percent, and you have
>       80 percent -- less than 80 percent of participation, you have about
>       70 percent, 60 percent of those ballots that are destroyed.  You have
>       more than enough.
>
> Q.   But are you suggesting that the commission does not prepare for the
>       eventuality that all these people actually vote?
>
> A.   Well, I think we have enough votes.  I testified that we have more than
>       330,000 ballots.  The commission has more than that.  And that was
>       Judge Conty's testimony, and that is my testimony too.

**Mr. Acevedo, however, cautioned that it will be feasible to get the ballots to the**

**polling places if the Court of Appeals acts by this Friday, October 19, 2012, for it will**

**take 10 to 12 days to do so, but if the Court waits to act until Tuesday of next week it**

**would not be feasible.**

CIVIL 12-1749CCC                                    9

- Regarding the need to deliver in packages of 325 and 50, as claimed by Mr. Bonet-Díaz, it is noted that his supervisor, Angel Luis Alvelo-Rivera, who is the Director of Electoral Operations at SEC, dismissed this practice as a requirement. Specifically on cross-examination by the SEC attorney, he testified as follows:

Q.      So the unit, the package unit, that you are using is 325 and 50 ballots?

A.      Yes. For this event, yes.

Q.      If you were to change that, you will have to start opening packages and repackaging.

A.      Yes. If I am told to send 75, then I have got to grab two with 50 and open them up and do that, yes.

Transcript of Angel Luis Alvelo-Rivera's testimony, October 15, 2012, pp. 74-75.

- This witness also established the existence of sufficient electoral materials such as ballot boxes, voting booths, pens, ink, lamps, batteries for the lamps, tape, plastic seals, records of incidences, canvassing sheets, and ballots. With respect to ballots:

A:      For these elections, I sent a requisition for 3,400,000 ballots. What that means is that at this point in time in warehouse there are 448,00 ballots, and that's it.

Q.      You mentioned that you have 448,000 ballots. Is that the total? Or 448,000 of each of the four types of ballots?

A.      Of each of the ballots. Yes. That's 448,000 ballots for the State election; 448,000 for the plebiscite; 448,000 for the legislative; and 448,000 for the municipal. Now, clearly, the 448,000 for the legislative are divided into 110 precincts or districts, and the 448,000 for the municipal are divided into 78 municipalities.

Q.      So after satisfying the needs of all of the briefcases to be used for the general election, you have still left 448,000 ballots of each kind; correct?

THE WITNESS: That is correct.

Transcript of Angel Luis Alvelo-Rivera's testimony, October 15, 2012, pp. 66-67.

- We return to the third and last stage raised by Mr. Acevedo and the data corresponding to it, to wit: election cards. All voters who did not vote in the 2008 elections had election cards with photos issued to them, which could be presented to the poll

watchers.  He acknowledged that there would be a number of I-8 voters who will require that cards be reissued either because they were lost or stolen, but the Juntas de Inscripción Permanente or JIPs (Permanent Inscription Boards) are open from now until Election Day and a "reactivated voter can get a new election card even on Election Day."  Transcript of Héctor L. Acevedo Testimony, October 15, 2012, p. 15.  He mentioned the obvious: that other regular voters who may not be able to find their cards would also have to go to the JIPs.  Additionally, SEC President Conty-Pérez gave assurance as to the sufficiency of the cards, testifying that:

> In September of this year, 2012, after an exhaustive bids process, again, for the first time we complied with a provision of the Puerto Rico Electoral Code, which is that the card has to be in both languages, and we managed to hire out for acquisition of 300,000 cards. That projection is based on the possibility that the 2.402,943 possible electors, the voters, to have sufficient cards for all of Puerto Rico because, unfortunately, many do get lost. And so in a little town somewhere somebody needs an ID card and they will ask for ours instead of looking for theirs. For these and other reasons, we have to have a backup for all of Puerto Rico, because one of the guarantes of the purity of the electoral process in Puerto Rico is precisely the electoral identification card or voter ID card.

Transcript of Héctor Conty-Perez, October 15, 2012, p. 123, lines 4-18.

- We now turn to Acevedo's proposal of a program which he understood addressed legitimate concerns as to safeguards, was simple, available, and anchored on the use of the provisional voting stations referred to in Spanish as "colegios de añadidos a mano" or "added-by-hand" polling places, which is a special polling station for voters who claim their right to vote and do not appear in the voting lists.  The SEC Regulation approved May 10, 2012 for the general elections of 2012 provides that there will be such a special polling station in each voting center to add voters by hand.  Mr. Acevedo testified that this special polling station is already established, serviced by all the political parties, and that there is one in every electoral unit.  Transcript of Héctor L. Acevedo, p. 19, lines 4-5.  The total

CIVIL 12-1749CCC                         11

number of such polling places is 1,533.[3]  Each has two voting booths, one for disabled and one for regular voters.  Id., at p. 29, lines 6-7.  As also stated by SEC expert Luz Delia Vázquez, he described the procedure as "one assigned to those voters who do not appear on the list,  are added by hand and extended a provisional ballot which is sealed and then sent to the State Elections Commission which validates them or invalidates them after the election."  Id., p. 19, lines 17-21.  This is an under-used polling station.  Acevedo pointed out that in the last election less than 12,000 voters went to these special polling places which is "less than 10 voters per 'colegio' [polling station] during the seven hour voting period."  Id., at p. 20, line 12.  One envelope contains the secret ballots of the voters added by hand, and the second envelope has electoral information about the voter that includes the voter's name, the names of the parents and the voter's electoral number.  The voter's oath is taken and he is added to a blank list.

        - Regarding Mr. Acevedo's proposed procedure, which provides safeguards and protects the right to vote of the I-8 voters, he describes it as follows: "It can be a procedure that the voter that goes to the colegio [polling station] reinstated affirms that his facts and address are the correct ones. If he says that he has moved to another town, then he could not be issued the ballot of Mayor or the legislative ballot."  Id., at p. 28, lines 1-5.  The residence factor would only be relevant as to the municipal and legislative ballots which have geographical demarcations.  He goes on to recommend that if the remedy is going to be provided by the Court of Appeals, "it should provide at least for a procedure that protects the honesty of that ballot, that will grant on this special occasion the ability of that party to recuse that vote by reason . . . of not living in Puerto Rico . . ."  Id., at p. 28, lines 10-14.  He observed that the poll watchers have a list with the photos of the voters in front of them to compare and the additional guarantee of the indelible ink and the lamp to check that the voter has not voted in some other place.  He further explained that the poll watchers can be

_____

[3]Mr. Acevedo misstated their number as 1,733 special polling places.

"trained that if the voter is not in that municipality, they cannot issue the municipal ballot nor the legislative ballot.  If he is living in the same place or in the same precinct that he was living in 2008, he would be issued the four ballots."  Id., at p. 30, lines 1-6.  The proposal provides that the I-8 voter can be recused by one of the poll watchers and then he has to counter recuse in accordance with the law.  Id., at p. 29, lines 17-18.  Since Puerto Rico law prohibits recusal based on residence on Election Day, it would require a Court Order to allow this type of recusal for the SEC does not have this authority.

     - Adoption of the Acevedo proposal would not require an additional 1,714 polling stations as claimed by most of the defendants nor additional poll watchers, relies on the premise that there are sufficient ballots and materials for the I-8 voters on Election Day, which have been proven,[4] guarantees the right of the 330,902 voters to participate in the 2012 election if reactivated while at the same time acknowledging that the safeguards provided by recusals will be available for poll watchers except for the recusal for residency, a matter that would have to be judicially mandated due to the unique circumstances surrounding the potential participation of these voters in the 2012 election.

     - The testimony of SEC expert Luz Delia Vázquez does not diminish the feasibility of the Acevedo proposal.  Utilizing the added by hand colleges at the different electoral units does not require that the same procedure utilized for regular voters who do not appear on the list on Election Day be also applied to the I-8 voters.  Her statement that there would be an overload of voters at these special polling stations causing that voters become tired and leave is based only on speculation.  She did not address at all the fact that these polling stations handle a much smaller amount of voters since only those who do not appear on the list are transferred to them.  Similarly, she admitted that her understanding that it takes

---

     [4]As noted before, Mr. Alvelo-Rivera established the existence of sufficient electoral materials such as ballot boxes, voting booths, pens, ink, lamps, batteries for the lamps, tape, plastic seals, records of incidences, canvassing sheets, etc.  See Transcript of Angel Luis Alvelo-Rivera's testimony, October 15, 2012, pp. 70-72.

CIVIL 12-1749CCC                              13

approximately 15 minutes to tend to a regular voter who is added by hand is not based on any personal experience.  The fact that there are no lists at these special polling places is of no significance since these polling places will have a list of the I-8 voters and she admitted that it is feasible to send a list of the I-8 voters to the added by hand polling stations.

Finally, her claim and that of others that none of the added by hand polling stations meet the requirements for disabled persons is a major contradiction for they have no qualms in receiving in those same polling stations regular voters who do not appear on the list and are handicapped.  She explained that the way poll watchers managed this situation is by taking the list outside to the disabled voter.  It is certainly not grounds for depriving any voter of the right to vote.  The blame falls squarely on the state system which does not comply with the laws that protect the disabled.

In sum, the Acevedo proposal meets all feasibility requirements.  The one circumstance that Mr. Acevedo raises and is for the Court of Appeals, of course, to decide, is whether, in a situation where there is a controversy as to the voter's residency, the procedure should include a Court-authorized poll watcher's right to recuse on grounds of residency on Election Day, something which is now prohibited by Puerto Rico law.  **This right to recusal for residency would occur only as to the I-8 voters on Election Day, November 6, 2012, should the poll watcher have grounds to believe that the voter's residence is not the one that appears on the list which the voter claims is still valid.** The justification given by Mr. Acevedo is that none of the I-8 voters were subject to recusal on grounds of residency since being deactivated in 2009.  All other grounds of recusal under Puerto Rico law are still available without Court Order.  If the proposal is determined to be feasible by the Court of Appeals, then the public interest in protecting the right of citizens to vote overrides all others.  The viability of the proposal itself neutralizes the claims of costs, burdens and potential threats to the electoral system in Puerto Rico.

CIVIL 12-1749CCC                              14

As stated before, the Acevedo proposal will only be feasible if acted upon by this Friday, October 19, 2012.

SO ORDERED.

At San Juan, Puerto Rico, on October 17, 2012 at 5:57 PM.

S/CARMEN CONSUELO CEREZO
United States District Judge